# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BRIAN HAYHURST, individually on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | 1:19CV657 |
| v. | ) ) | |
| KELLER WILLIAMS REALTY, INC., a Texas corporation, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Keller Williams Realty, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint [Doc. #13]. Plaintiff Brian Hayhurst, on behalf of himself and purported class members, alleges that Keller Williams Realty, Inc. ("Keller Williams") violated the Telephone Consumer Protection Act ("TCPA") when it or its agents called Hayhurst and others without prior express written consent using a pre-recorded voice and automated telephone dialing systems all while his and others' telephone numbers were registered on the national do-not-call registry. (See generally Am. Compl. [Doc. #11].) Keller Williams argues that Hayhurst has failed to state a claim for which relief can be granted because he cannot pursue direct liability, he has not sufficiently alleged vicarious liability, and, even had he done so, he has not sufficiently alleged that he received a call from an automated telephone dialing system. (See generally Def.'s

Mem. of Law in Supp. of its Mot. to Dismiss Pl.'s Am. Compl. ("Def.'s Mem. in Supp.") [Doc. #14].) For the reasons explained below, the motion is denied.

I.

Keller Williams is one of the largest real estate franchises in the world and is recognized "'as the world's #1 training organization across all industries.'" (Am. Compl. ¶¶ 2, 3.)

> [A] key component of Keller Williams' marketing plan for realtors instilled through its award winning training and coaching programs has been for realtors to purchase lists of potential leads for real estate listings from lead provider companies . . . that generate personal phone numbers associated with expired listings on the multiple listing service (MLS) . . . and which provide[] a web-hosted autodialer for realtors to make marketing calls en masse to those numbers without the recipients' consent.

(Id. ¶ 4; see also id. ¶ 11 (alleging that Keller Williams "directs realtors to use certain prescribed practices to market [the company's] realty services, including unsolicited, prerecorded and autodialed calls"), ¶ 12 (asserting that "Keller Williams encourages realtors to call property owners generated from expired listings on the MLS").)

As part of this marketing, Keller Williams "promotes specific scripts" for realtors to use when calling individuals. (Id. ¶ 13 (citing Expired Listings (2004 Keller Williams Realty Inc.), Ex. 1 to Am. Compl.).) For example, there are scripts promoting Keller Williams as the number one agent in properties sold and a script inquiring if the home owner is still interested in selling his or her home if the realtor had a buyer. (Ex. 1, Expired Listings.) Particularly relevant here, one script reads in

part, "Hello, this is _____ with the _____ group, and I noticed that your property has expired on the MLS.  Are you still interested in selling your home? . . ." (Id.)  There are tips throughout the various scripts such as, "The key to prospecting for Expireds is to overcome their disappointment and position yourself as the knowledgeable, dependable, trustworthy, results-oriented professional they are looking for." (Id.)

In addition, Keller Williams provides training videos through KWconnect.com, some of which teach agents how to call expired listings. (Am. Compl. ¶ 14.) These videos are entitled, "Does Cold Calling Expired Listings Even Work? (The Truth)", "LIVE Cold Call (+Expired Listing Appointment Set)", "Expired Listing Lead Generation & Prospecting", "FSBO's and Expired Listings – Newscast", "FSBO and Expired Listings Extreme Training Camp with Kevin Ward", "Real Estate Training / Scripts for FSBO and Expired Listings / Real Estate Training", "Expired Listings 101 with Rachel Adams Lee", and "Expired Listings: Go Pro". (Id. ¶¶ 15-20.[1])

Keller Williams also maintains a program of Approved Vendors, including those that mine consumer data from expired MLS listings for agents, to whom it gives a "'trusted'" seal of approval and "'[a]ccess to more than 150,000 Keller Williams associates and more than 750 franchises throughout the United States and Canada.'" (Id. ¶ 21.)  Landvoice is one of Keller Williams' primary approved

---

[1] Hayhurst details some of the contents of many of these videos in the Amended Complaint. (See Am. Compl. ¶¶ 15-17, 19-20.)

3

vendors, and it "sells agents lists of real estate leads, researches telephone numbers associated with the leads, and provides agents with an online automatic telephone dialing system which allows them to load the lists of leads using a sequential number generator and then dial them." (Id.; see also id. ¶ 35 (illustrating Landvoice as a "Keller Williams Approved Vendor").) Landvoice "'deliver[s] the highest quality and quantity of owner contact information including cell phone numbers' . . . for each lead to ensure that the agent calling has the best chance of reaching the client." (Id. ¶ 29.)

Its "service includes the automatic loading of the Landvoice-generated leads list, using a sequential number generator, into a 'Power Dialer,' an automatic telephone dialing system that 'dial[s] leads' at a rate of 80 to 300 per hour and delivers a pre-recorded message if calls are not answered". (Id. ¶ 30 (illustrating an integrated system in which "leads are automatically pushed into the dialer" and "other leads" are "[s]imply import[ed]" with "a CSV file").)

Landvoice regularly participates and presents at Keller Williams Family Reunion, "a yearly event with over 10,000 attendees, which features Keller Williams executives and master faculty leading education sessions covering sales skills, leadership skills, and technology training", where Keller Williams trainers instruct agents "to purchase lead lists and call them using an autodialer" such as Landvoice, Mojo Dialer, and archagent PowerDialer. (Id. ¶¶ 32, 33; see also id. ¶ 31 (illustrating Landvoice's announcements, "We are excited to announce . . . Landvoice has teamed with Keller Williams" and "Complete the registration to

4

begin receiving Special KW prices").)  The CEO of KW MAPS Coaching developed a training program "centered around obtaining Landvoice generated leads and autodialing them", and agents who enroll in the training program are given a free trial account with Landvoice. (Id. ¶ 35.)

A similar vendor that Keller Williams promotes through its KW University and KW MAPS coaching programs is RedX, which identifies "property listings from the MLS, locate[s] the property owners of those listings, and generate[s] personal phone numbers of those property owners who [sic] they sell to real estate agents along with access to a dialer to call those agents [sic], many of which are registered on the Do Not Call registry." (Id. ¶¶ 22, 23.)  At the Keller Williams Family Reunion, KW Maps coaches "instruct realtors to use RedX and provide scripts for cold calling expired leads." (Id. ¶ 24 (citing PowerPoint presentation by KW MAPS coaches Craig and Annmarie Reger, Ex. 2 to Am. Compl.).)  And, at another KW Maps program, Keller Williams coaches "instruct realtors to 'Get a system for phone numbers such as REDX' and a 'Mojo Dialer' or 'triple dialer.'" (Id. ¶ 26 (citing Mastermind presentation notes (Aug. 2015), Ex. 3 to Am. Compl.).) Not only has Keller Williams trained its realtors on the importance of RedX, but in Keller Williams' magazine "Outfront", it credits RedX for Keller Williams realtors' success, "'With so many outbound calls made daily, they use RedX and Mojo to power-dial and auto-dial so that they can decrease their downtime and increase their productivity.'" (Id. ¶ 27.)

5

Hayhurst's personal cellular telephone ("cell phone") number has been registered on the Do-Not-Call Registry since July 22, 2003. (Id. ¶ 42.) On May 31, 2019, his property listing on the MLS expired, and he soon began receiving calls on his cell phone from or on behalf of Keller Williams agents. (Id. ¶¶ 43, 45-53.) On June 1, 2019, Hayhurst received a call on his cell phone from 336-609-6016 that went to voicemail at which point the caller left a pre-recorded message stating,

> "Hi, this is Karmel from Keller Williams realty, I saw that your house is not listed on the MLS anymore, I was wondering when you are ready to interview real estate agents to get your house sold. Please give me a call at 336-609-6016[.] I would greatly love the opportunity to talk to you."

(Id. ¶¶ 46, 47.)

Three days later, on June 4, he received a second call, and when he answered, he "said hello several times, but there was no one on the line." (Id. ¶¶ 48, 49.) "Finally, he heard a beep and a live person got on the call", leading Hayhurst to believe he was called by an autodialer. (Id. ¶ 49.) The person calling identified herself as Karmel from Keller Williams. (Id. ¶ 50.) The following day, on June 5, Hayhurst received another call, this time from 336-592-7546. (Id. ¶ 51.) As before, when he answered, he "heard several seconds of dead air before a live operator came on the line" and identified herself as calling from Vazuio City, Philippines on behalf of Keller Williams agent Gary Hernandez. (Id. ¶¶ 52-53.) Hayhurst asked how she obtained his phone number, and she said "from the RedX system they are using." (Id. ¶ 54.)

Case 1:19-cv-00657-NCT-JEP   Document 37   Filed 07/22/20   Page 6 of 28

II.

Hayhurst initiated this putative class action, alleging Keller Williams violated the TCPA, specifically 47 U.S.C. § 227(b)(1)(A)(iii), when it or its agents called Hayhurst and others using a prerecorded voice (First Claim for Relief) and equipment that has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator (Second Claim for Relief) without Hayhurst's or others' prior express consent. (Am. Compl. ¶¶ 61-68.)  He also alleges that Keller Williams violated 47 C.F.R. § 64.1200(c) by initiating or causing to be initiated, more than once in a 12-month period, telephone solicitations to Hayhurst and others whose telephone numbers were registered on the national Do-Not-Call Registry. (Id. ¶ 69-73.)  Keller Williams has moved to dismiss the action for failure to state a claim upon which relief can be granted.

To survive a motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a

7

claim to relief that is <u>plausible</u> on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557). When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in his favor. <u>U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency</u>, 745 F.3d 131, 136 (4th Cir. 2014). Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. <u>Twombly</u>, 550 U.S. at 557. In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level". <u>Id.</u> at 555.

A.

Keller Williams first challenges the sufficiency of the allegations as to its liability – direct or vicarious – for the alleged statutory violations. The TCPA makes it unlawful "for any person . . . to make any call (other than a call for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii); <u>see also</u> 47 U.S.C. § 227(b)(3) (creating a private right

8

of action for a violation of this subsection).  It is also unlawful for "any person" to "mak[e] or transmit[] a telephone solicitation to the telephone number of any subscriber included in [the national Do-Not-Call Registry]." 47 U.S.C. § 227(c)(3)(F); see also 47 U.S.C. § 227(c)(5) (creating a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity"); 47 C.F.R. § 64.1200 (implementing 47 U.S.C. § 227(c)(3)(F)).  As is relevant here, "'person' includes an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39).

The parties appear to agree that Keller Williams did not make these calls and that vicarious, not direct, liability applies. (See Def.'s Mem. of Law at 5; Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Resp.") at 4-12 [Doc. #23] (focusing entirely on various liability).) Cf. In re Joint Petition Filed by Dish Network, LLC, 28 F.C.C.R. 6574, 6574 (2013) ("Dish Network") (clarifying that "a seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA").  Instead, the parties dispute the sufficiency of the allegations in support of vicarious liability.

Keller Williams makes several arguments in support of its general contention that the Amended Complaint fails to allege plausibly that the calls were made on its behalf. (Def.'s Mem. of Law at 5-14.)  As Keller Williams sees it, the "allegations show that the realtors (and not [Keller Williams]) controlled the manner and means in which they contacted [Hayhurst]." (Id. at 6.)  For example, one of

9

the videos cited in the Amended Complaint shows "that realtors have full discretion on how they can market their services", as do the allegations of the different ways the realtors contacted Hayhurst. (Id. at 6-7.) According to Keller Williams, there are no allegations that the company had the power to give interim instructions to realtors, while the allegations show the realtors paid for training and services they chose. (Def.'s Reply in Supp. of its Mot. to Dismiss Pl.'s Am. Compl. ("Def.'s Reply") at 5-6 [Doc. #31].) In addition, according to Keller Williams, there are no factual allegations supporting an agency relationship between it and Karmel, whom the company asserts is not a licensed North Carolina realtor, or one of its franchises or how Keller Williams was involved in a call by a realtor using an alias. (Def.'s Mem. of Law at 8.) Keller Williams also maintains that realtors are independent contractors whose tortious conduct generally is not imputed to the employer. (Id. at 9 (citing Century Land Dev. L.P. v. Weits, No. 07-14377-CIV, 2009 WL 252091 (S.D. Fla. Feb. 2, 2009) (granting summary judgment to Keller Williams on professional negligence and negligence claims under Florida law where realtor was found to be an independent contractor).) The company also argues that there are no allegations that it said or did anything on which Hayhurst reasonably relied, thus also foreclosing a finding of apparent authority. (Def.'s Reply at 7.) Without an agency relationship, the company argues, the allegations of ratification also fail. (Def.'s Mem. of Law at 10-11.) Finally, to bind Hayhurst to his original Complaint, Keller Williams relies heavily on the purported strength of its arguments to dismiss the original Complaint and the distinction between some of

its allegations and those in the Amended Complaint. (Id. at 11-13.)

Hayhurst responds that his allegations of Keller Williams' training programs and materials and preferred vendor program are sufficient to show that it was reasonable for realtors to believe the company was directing the means and manner of their calls and that they were acting with actual authority to do so. (Pl.'s Resp. at 7-8; see also id. at 9 (distinguishing Century Land Dev. L.P.).) This is further evidenced, Hayhurst argues, by the allegations that the individuals who called him identified themselves as calling from Keller Williams, one caller's message followed a Keller Williams script, and another caller identified a Keller Williams-promoted vendor as the source of Hayhurst's telephone number. (Id. at 8-9; see also id. at 5-6 (citing Valdes v. Century 21 Real Estate, LLC, No. 2:19-05411, 2019 WL 5388162 (D.N.J. Oct. 21, 2019) (finding the plaintiff sufficiently pled an agency relationship between Century 21 Real Estate, LLC and franchisees in TCPA action).) Hayhurst contends these same allegations support apparent authority and ratification. (Id. at 9-12.)

"The Federal Communications Commission (the 'FCC') interprets the TCPA to allow vicarious liability for violation of § 227(b) and § 227(c)" as found in "the federal common law of agency, 'including not only formal agency, but also principles of apparent authority and ratification.'" Hodgin v. UTC Fire & Security Americas Corp., Inc., 885 F.3d 243, 251-52 (4th Cir. 2018) (quoting Dish Network, 28 F.C.C.R. at 6584). The Fourth Circuit has also found that the "plain language" of "the TCPA's private right of action [for Do-Not-Call violations]

11

contemplates that a company can be held liable for calls made on its behalf, even if not placed by the company directly." Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 659 (4th Cir. 2019) (citing 47 U.S.C. § 227(c)(5)). Although there is "no clear definition of 'on behalf of' in the TCPA," the court "assume[d] that federal statutes are written with familiar common law agency principles in mind." Id.; see also Dish Network, 28 F.C.C.R. at 6585 ("Standard dictionary definitions of the phrase 'on behalf of' include . . . concepts that easily can be read to encompass common law agency principles."). "To determine these common law principles, courts have traditionally looked to the Restatement of Agency." Hodgin, 885 F.3d at 252.

An agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006); see also Krakauer, 925 F.3d at 659-660 (stating the same and citing the Restatement). "Once such a relationship is formed, 'traditional vicarious liability rules ordinarily make principals . . . vicariously liable for acts of their agents . . . in the scope of their authority.'" Id. at 660 (quoting Meyer v. Holley, 537 U.S. 280, 285-86 (2003)). "An essential element of agency is the principal's right to control the agent's actions", but this concept of control "embraces a wide spectrum of meanings", including "what the agent shall and shall not do, in specific or general terms." Restatement (Third) of Agency § 1.01 cmt f. "A principal's control over

an agent will as a practical matter be incomplete because no agent is an automaton who mindlessly but perfectly executes commands." Id.

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Id. § 2.01. Actual authority may be given expressly such as when the principal states "in very specific or detailed language" how an agent is to act or impliedly such as when an agent acts "in a manner in which [the] agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent." Id. § 2.01 cmt. b.

At this stage of the proceedings, Hayhurst has sufficiently alleged an agency relationship between Keller Williams and the individuals who called him. The allegations show that Keller Williams manifested its assent in a number of ways for its realtors to act on its behalf, subject to its control, and the realtors who called Hayhurst so acted. There are the numerous videos on KWConnect.com about using expired listings to generate leads; the various scripts for Keller Williams agents to use when calling individuals with expired listings, one of which was similar to the pre-recorded message Karmel left for Hayhurst; an Approved Vendor Program that gives companies like Landvoice access to more than 150,000 Keller Williams associates and more than 750 franchises; the regular participation of Landvoice representatives at Keller Williams Family Reunion, an annual event with

13

over 10,000 attendees featuring Keller Williams executives and master faculty leading training; the training program developed by the CEO of KW Maps Coaching centered around obtaining Landvoice-generated leads and autodialing them which Keller Williams claims has helped tens of thousands of its agents; the Keller Williams trainers from Keller Williams University (which provides an industry-leading curriculum addressing every aspect of success in real estate) who direct agents to purchase lead lists and call them using an autodialer; and, at Keller Williams Family Reunion, on Keller Williams' blog, as part of KW Maps programming, and in Keller Williams' magazine, the promotion of and instruction to use RedX, a company similar to Landvoice and the company from whom the last caller obtained Hayhurst's number.  As Hayhurst alleges, the coaching and training programs and materials of Keller Williams, which has consistently been in the top five on the Training 25 "which ranks excellence in employer-sponsored training and development programs", are "an integral part" of its franchise system and "the means by which Keller Williams controls the manner in which realtors market for new listings".

Keller Williams argues that the allegations actually show that realtors exercised their own discretion to market their services, but as the Restatement recognizes, control "embraces a wide spectrum of meanings" and, "as a practical matter", Keller Williams' control over its realtors will "be incomplete because no agent is an automaton who mindlessly but perfectly executes commands."  Even the scripts provided to realtors reflect that, despite the varying situations realtors

14

may face when cold-calling leads, Keller Williams has planned a corresponding conversation between the realtor and the prospective customer.

And, despite Keller Williams' argument that Hayhurst also failed to connect the company to any of the callers, he alleged that "'Karmel[2] from Keller Williams realty'" left the June 1, 2019 pre-recorded voicemail similar to one of the company's calling scripts, "Karmel from Keller Williams" called again on June 4, 2019 to "solicit[] [Hayhurst] to relist his property with her", and an operator "calling for Keller Williams agent Gary Hernandez" spoke with Hayhurst on June 5, 2019 and identified RedX as the source of Hayhurst's telephone number. At this stage of the proceedings, these allegations, in light of all others, are sufficient to connect the callers with Keller Williams. See Hossfeld v. Gov't Empls. Ins. Co., 88 F. Supp. 3d 504, 510 n.12 (D. Md. 2015) (noting in response to defendant's argument "that the Plaintiffs have not included enough facts about the relationship between the third-party telemarketer and GEICO to establish vicarious liability" for alleged TCPA violations that "the Plaintiffs 'need not plead the identity of every player in the alleged scheme nor every nuance of the relationships . . . ; indeed, the information necessary to connect all the players is likely in [GEICO's] sole possession") (quoting Kristensen v. Credit Payment Servs., 12 F. Supp. 3d 1292, 1302 (D. Nev. 2014)). The allegations show that Karmel and someone else on

---

[2] Keller Williams contends that there is no Karmel listed among North Carolina's licensed realtors. However, that argument is not properly before the Court on a Rule 12(b)(6) motion.

behalf of Keller Williams acted with actual authority when they called Hayhurst in the face of Keller Williams' specific, detailed training and materials, as well as with implied authority because a reasonable realtor would interpret the company's extensive training operations, its content, and materials as manifesting Keller Williams' expectation that agents obtain lead generating lists of expired MLS listings from companies like Landvoice and RedX and use an automatic dialer to call prospective clients, whether or not they had not consented to receive such calls or had registered their telephone numbers on the national Do Not Call Registry.

Understandably, Keller Williams relies on Century Land where summary judgment was granted in favor of Keller Williams Realty of the Palm Beaches because it could not be held vicariously liable for a realtor's conduct. However, not only are the facts and legal claims of Century Land distinguishable from those alleged here, but it was decided on summary judgment in an unpublished and otherwise non-binding opinion. 2009 WL 252091 (applying Florida law and granting summary judgment to Keller Williams Realty of the Palm Beaches on claims of breach of fiduciary duty, professional and ordinary negligence, and constructive fraud where realtor and the company had entered into an independent contractor agreement).

At this stage, a more applicable, albeit also unpublished and otherwise non-binding, opinion is Valdese where the court denied Century 21 Real Estate, LLC's motion to dismiss the TCPA claims against it. 2019 WL 5388162. The court

16

explained that

> a plaintiff sufficiently pleads that a defendant directed a realtor's calls by alleging that the caller "expressly mentioned" the defendant "by name"; that the defendant had the authority to "revise[]" call "scripts" or provide feedback regarding calls; that the defendant had authority to "provide[] lead lists"; that the defendant was "aware" that an autodialer was being used and/or other acts giving rise to an inference that the defendant was "heavily involved" in the "sales practices and marketing procedures".

Id. at *4 (quoting United States v. Dish Network LLC, 256 F. Supp. 3d 810, 922-23 (C.D. Ill. 2017) (proceeding at summary judgment stage), aff'd in part, reversed in part on other grounds, 954 F.3d 970 (7th Cir. 2020)).  The court found sufficient plaintiff's allegations that through "its training techniques, Century 21 in effect directed realtors to solicit business for Century 21's and the realtors' common benefit by purchasing lists of leads associated with expired listings and similar properties and calling them repeatedly with an autodialer." Id. at *4.  The plaintiff had alleged that the company "instructed realtors on how frequently to make calls and on what to say during calls:  to identify themselves as calling on behalf of Century 21, to offer the Century 21 pledge, and to solicit expired listings" and "facilitated realtors' access to lead lists and autodialers." Id. See also Hossfeld, 88 F. Supp. 3d at 510-11 (finding allegations sufficient for vicarious liability under the TCPA where the plaintiffs "alleged that GEICO contracted with third-party telemarketers, created scripts for those telemarketers, knew the third-parties were using automated dialing systems in violation of the TCPA, and had the third-parties make calls with those systems before forwarding the call to GEICO

17

sales representatives").

The agents who called Hayhurst also plausibly did so with apparent authority. "[W]hen a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations", which can be by "written or spoken words or other conduct", an agent acts with apparent authority. Restatement (Third) of Agency § 1.03 (defining manifestation), § 2.03 (defining apparent authority); see also id. § 3.03 (explaining creation of apparent authority). In other words, "an agent is imbued with apparent authority to bind his or her principal if a third person could reasonably interpret acts or omissions of the principal as indicating that the agent has authority to act on behalf of the principal." Crothers v. Commodity Futures Trading Comm'n, 33 F.3d 405, 410 (4th Cir. 1994) (quoting Metco Prods., Inc. v. N.L.R.B., 884 F.2d 156, 159 (4th Cir. 1989); see also Bridgeview Health Care Center, Ltd. v. Clark, 816 F.3d 935, 939 (7th Cir. 2016) ("To create apparent authority, the principal must speak, write, or otherwise act toward a third party" and its "conduct must make the third party reasonably believe that [it] has consented to an action done on [its] behalf by someone purporting to act for him."); N.L.R.B. v. Local Union 1058, United Mine Workers of America, 957 F.2d 149, 153 (4th Cir. 1992) (requiring the principal to have made some manifestation to the third party). A manifestation by a principal "may take many forms", such as the principal's making "explicit statements" "directly to a third party", requiring "the agent's name and affiliation with the principal be included in a listing of

18

representatives that is provided to a third party", directing the "agent to make statements to third parties" or "perform acts", or "placing the agent in charge of a transaction or situation." Restatement Agency § 2.03 cmt. c. "Apparent authority often coincides with actual authority" where "the agent has acted consistently with what the agent reasonably believes the principal wishes the agent to do" "and the principal's manifestations are the basis for the third party's reasonable belief that the principal has authorized the agent's acts." Id.

Keller Williams argues that Hayhurst fails to "allege he had any contact with [Keller Williams'] independent franchisees much less [Keller Williams]" or "any communication from [Keller Williams] to [Hayhurst] that would qualify as a 'manifestation of the principal'". (Def.'s Reply at 7.) Although Keller Williams is not alleged to have made any statements directly to Hayhurst, it is not required to do so. Rather, its manifestations must be "traceable" to it even if it did not make them directly to Hayhurst. And, its manifestations "may take many forms". See Dish Network, 28 F.C.C.R. 6592 (providing "illustrative examples of evidence that may demonstrate" apparent authority). Here, Keller Williams is alleged to have provided realtors with scripts to use while cold-calling individuals in which they are to refer to themselves as being "with Keller Williams Realty" and explain that "we're [your] County's number one agent in properties sold", "[w]e specialize in homes that should have sold but didn't", among other similar statements. The content of the telephone calls made to Hayhurst is traceable to Keller Williams by way of its extensive training and materials.

19

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." <u>Hodgin</u>, 885 F.3d at 252 (quoting Restatement (Third) of Agency § 4.01(1)). As the <u>Hodgin</u> court recognized, "'[a] party may ratify an act" if it has "'knowledge of material facts involved in the original act'" and fails "'to object to it or to repudiate it'". <u>Id.</u> (quoting Restatement (Third) of Agency § 4.01 cmt. f., § 4.06). Keller Williams argues that ratification fails because, not only has Hayhurst not sufficiently alleged an agency relationship, but also because "the allegations show that the calls should <u>not</u> have been made; Landvoice – a 'primary approved vendor' – would have identified his number as an expired listing on the DNC list, and one not to call." (Def.'s Mem. of Law at 10-11; <u>see also</u> <u>id.</u> at 4 (citing Landvoice's website)[3].) As explained above, Hayhurst has sufficiently alleged an agency relationship and actual and apparent authority. To the extent it is necessary, if at all, he has also sufficiently alleged that Keller Williams knew its agents were using RedX to obtain listing leads and using autodialers to call those leads. For example, he alleges that "many" of the numbers RedX sells to real estate agents "are registered on the Do Not Call registry", KW Maps coaches instructed realtors at Keller Williams Family Reunion and elsewhere to use RedX, the company's magazine credited the use of RedX with Keller Williams' success, and RedX was

---

[3] Keller Williams impermissibly cites to www.landvoice.com/help, a website identified differently than the one Hayhurst cited in his Amended Complaint (<u>see</u> Am. Compl. n.33 (https://landvoice.com/bold/welcome/)) and videos apparently cited in Hayhurst's initial Complaint but not in his Amended Complaint.

20

the source of Hayhurst's telephone number to at least one of his callers. Not only does Hayhurst allege that RedX sells access to a dialer to call leads, but that as part of its extensive training Keller Williams touts the importance of using an autodialer.

Keller Williams also attempts to dismiss the Amended Complaint by binding Hayhurst to now-abandoned allegations from his original Complaint that Keller Williams previously moved to dismiss, but this effort fails. Keller Williams argues that Hayhurst initially alleged that it trained and directed realtors to use Landvoice, but those allegations showed that Keller Williams could not be vicariously liable for the calls to Hayhurst because he received a call through RedX and the Philippines, not from Landvoice. (Def.'s Mem. of Law at 12.) In his original Complaint, Hayhurst also cited a video allegedly produced and used by Keller Williams to train realtors how to use Landvoice, but the video actually showed that the calls at issue should not have been made because the numbers were on the Do Not Call registry. (Id. at 13.) Hayhurst omitted these allegations from his Amended Complaint. Nevertheless, Keller Williams contends that these now-abandoned allegations "should not go unnoticed" and cites cases from the D.C. Circuit, the D.C. District Court, the Southern District of New York, and the Eastern District of New York. (Id. at 12.)

The defendant in New Hickory Pizza, Inc. v. TIG Insurance Co., No. 5:16-cv-164-RLV-DSC, 2017 WL 3840278, at *5 (W.D.N.C. Aug. 31, 2017), made the same arguments when it moved to dismiss an amended complaint because of the

21

plaintiff's allegations in the original complaint. Like Keller Williams, the defendant cited opinions from district courts in the Second Circuit where plaintiffs were held "to prior allegations when allegations in a superseding complaint 'directly contradict' or are 'entirely inconsistent' with the prior allegations." Id. But, as the court recognized, "[t]his approach . . . does not appear to be the majority approach even in the Second Circuit" where most district courts "consider prior inconsistent pleadings relevant, but only as controvertible, not conclusive admissions". Id. (citing Palm Beach Strategic Income, LP v. Salzman, No. 10-CV-261 (JS)(AKT), 2011 WL 1655575, at *5-*6 (E.D.N.Y. May 2, 2011), aff'd, 457 F. App'x 40 (2d Cir. Jan. 26, 2012)). The court found "substantial authority for the proposition that an allegation in a superseded complaint should not be considered at the motion to dismiss stage, although it might be considered at a later stage." Id. *6-*7 (quoting West Run Student Housing Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 171-73 (3d Cir. 2013) (citing cases from the First, Fifth, Seventh, and Ninth Circuit Courts of Appeals)). New Hickory Pizza, Inc. is instructive, and West Run Student Housing Assocs., LLC is persuasive.

"Perhaps the most common use of Rule 15(a) is by a party seeking to amend in order to cure a defective pleading", as the Rule "reinforces one of the basic policies of the federal rules – that pleadings are not an end in themselves but are only a means to assist in the presentation of a case to enable it to be decided on the merits." Arthur R. Miller, Mary Kay Kane, and A. Benjamin Spencer, 6 Fed. Prac. & Proc. Civ. §§ 1473, 1474 (3d ed.). And, as the Fourth Circuit Court of

22

Appeals has recognized, "[a] plaintiff who wishes to amend a complaint is not limited merely to adding allegations to the original pleadings; rather, the pleading may remove or, plainly, amend the original allegations by filing an amended complaint." Goode v. Central Va. Legal Aid Society, Inc., 807 F.3d 619, 627, 627 n.6. (2015). Therefore, at this stage, the allegations in the Amended Complaint are the only allegations assessed, and, as explained above, they have been found sufficient as to vicarious liability for the telephone calls made to Hayhurst.

## B.

Next, Keller Williams argues that the "allegations establish that [Hayhurst] did not receive calls from an 'automatic telephone dialing system' ('ATDS')." (Def.'s Mem. of Law at 14.) As it explains, the D.C. Circuit invalidated the definition of an ATDS in the Federal Communications Commission's 2015 Declaratory Ruling, leaving only the statutory language as guidance. (Id. at 14-16 (citing ACA Int'l v. Fed. Commc'ns Comm'n, 885 F.3d 687 (D.C. Cir. 2018)).) Keller Williams interprets the statute to mean that a device must have "the capacity to generate telephone numbers, either randomly or sequentially", which it argues Hayhurst does not allege. (Id. at 16-17.) Keller Williams also argues that "the Landvoice system cannot dial numbers without human intervention" and, thus, cannot dial numbers automatically. (Id. at 17.)

Hayhurst responds that, at this stage of the proceeding, he only needs to "identify[] 'circumstances surrounding' the calls that 'create a plausible inference of autodialing,' including: their 'commercial' content; that multiple calls were

23

made to the same recipient; and that they were made without the recipient's consent." (Pl.'s Resp. at 12-13 (citing cases from the Southern District of Florida and the North District of Illinois that predate the D.C. Circuit's opinion in ACA Int'l). And, Hayhurst argues, he has done just that and more by alleging the calls he received were commercial, he received multiple similar calls, the calls were made without his consent, other consumers received similar calls under similar circumstances, one of the realtors used a platform capable of transmitting prerecorded voice messages, one caller obtained his number from RedX, and Keller Williams' realtors have been trained to use autodialers. (Id. at 13-14.)

An "automatic telephone dialing system" is "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227 (a)(1). And, it is "unlawful for any person . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii). Pursuant to its directive to promulgate implementing regulations and its authority to issue rulings, see 47 U.S.C. § 227(b)(2), the Federal Communications Commission ("FCC") has done just that over the years. But, its 2015 Declaratory Ruling and Order, part of which was an attempt to clarify which devices qualify as an ATDS, "fail[ed] to satisfy the requirement of reasoned decisionmaking" in violation of the Administrative Procedure Act, and the D.C. Circuit, in relevant part,

24

"set aside the Commission's explanation of which devices qualify as an ATDS".
ACA Int'l, 885 F.3d at 693-95, 703.

Since ACA Int'l, courts have struggled to interpret § 227(a)(1)'s definition of an ATDS, and a circuit split has emerged about what exactly the phrase "using a random or sequential number generator" modifies. Compare Gadelhak v. AT&T Servs., Inc., 950 F.3d 458 (7th Cir. 2020); Glasser v. Hilton Grand Vacations Co., 948 F.3d 1301 (11th Cir. 2020); and Dominguez v. Yahoo, Inc., 894 F.3d 116 (3d Cir. 2018)[4] with Duran v. La Boom Disco, Inc., 955 F.3d 279 (2d Cir. 2020) and Marks v. Crunch San Diego, LLC, 904 F.3d 1041 (9th Cir. 2018). The Seventh and Eleventh Circuits determined that an ATDS is one that stores telephone numbers using a random or sequential number generator or produces telephone numbers using a random or sequential number generator. In other words, the phrase "using a random or sequential number generator" modifies both "store" and "produce". In so finding, they applied rules of grammar and punctuation, the statute's language, its history and context, and contemporaneous understandings. See Gadelhak, 950 F.3d at 463-68; Glasser, 948 F.3d at 1306-09. As they wrestled with the statute, the courts expressed frustration with its drafting and discomfort with their ultimate conclusions. The Glasser court explained, "Clarity,

---

[4] The court in Marks v. Crunch San Diego, LLC, 994 F.3d 1041, 1052 n.8 (9th Cir. 2018) criticized the Dominguez court as having made an "unreasoned assumption" when it "avoided the interpretive questions raised by the statutory definition of ATDS" and "failed to resolve the linguistic problem" it had identified in an earlier unpublished decision in the same case.

we lament, does not leap off this page of the U.S. code. Each interpretation runs into hurdles. In the absence of an ideal option, we pick the better option". 948 F.3d at 1306. After working through four possible interpretations of the definition of an ATDS, the Gadelhak court described its choice among the four as "admittedly imperfect" but "lack[ing] the more significant problems of the other three interpretations" and "thus [the court's] best reading of a thorny statutory provision." 950 F.3d at 468.

The Ninth and Second Circuits determined that a device qualifies as an ATDS if it stores telephone numbers to be called and calls them, even if those numbers were not generated by a random or sequential number generator. In other words, the phrase "using a random or sequential number generator" modifies only "produce" and not "store". These courts, too, recognized that the "statutory language leaves much to interpretation." Duran, 955 F.3d at 283; see also Marks, 904 F.3d at 1051 (noting that the panel was "struggling with the statutory language"). And, although the panels in Marks and Duran approached the analysis slightly differently from one another, compare Marks, 904 F.3d at 1049-52 (after finding the FCC's prior orders on the issue were no longer binding and the statutory language was ambiguous, concluding the context and structure of the statutory scheme supported its definition) with Duran, 955 F.3d at 283-87 (reading the statute to "avoid[] rendering any word" "'surplusage'" and finding that both the purpose and structure of the statute and the FCC's still-valid and consistent interpretations confirm its definition), and, although reasonable minds

26

differ, their conclusion effectuates Congress's intent. And, it is this definition that is more persuasive to the Court.

In that light, there is no doubt that Hayhurst has sufficiently pled that he received telephone calls from an ATDS. When he answered the second telephone call, there was no one on the line and only after he heard a beep did Karmel join the call. (Id. ¶ 49.) She had left a pre-recorded message when Hayhurst failed to answer her first call. (Id. ¶ 47.) When Hayhurst answered the third telephone call, there were several seconds of "dead air" before the operator came on. (Id. ¶ 52.) Later she would tell him that she obtained his telephone number from "the RedX system they [were] using." (Id. ¶ 54.)

He detailed how Keller Williams integrates the Landvoice and RedX systems into its training programs and consistently described those systems as importing lists of telephone numbers belonging to individuals with expired MLS listings into a dialer. For example, Landvoice can automatically load its generated lead lists into a Power Dialer, "an automatic telephone dialing system that 'dial[s] leads' at a rate of 80 to 300 per hour and delivers a pre-recorded message if calls are not answered". (Am. Compl. ¶ 30.) RedX sells its leads lists and access to a dialer to agents. As proclaimed on Keller Williams' blog, "[T]he team got creative, looking up everyone who expired between the years of 2007 and 2011" which "returned 100,000 homes, which begged the next question: how do you crank through that many phone calls in just 90 days? Ultimately, they decided to leverage Red X and

27

MOJO Powerdialer, purchased BOOM headphones, and added more phone lines . . . ." (Id. ¶¶ 22, 25.)

Hayhurst has not only sufficiently alleged that these systems have the capacity to store a list of telephone numbers, but also that they can dial them automatically. "By referring to the relevant device as an 'automatic telephone dialing system,' Congress made clear that it was targeting equipment that could engage in automatic dialing, rather than equipment that operated without any human oversight or control." Marks, 904 F.3d at 1052. "Common sense indicates that human intervention of some sort is required before an autodialer can begin making calls, whether turning on the machine or initiating its functions." Id. at 1052-53; see also Duran, 955 F.3d at 289-90 (concluding the same). It is reasonable to infer that these systems are dialing the telephone numbers, even if the agent must tell the system to begin doing so.

Therefore, at this stage of the proceedings, Hayhurst's claim that Keller Williams violated the TCPA by using an autodialer survives.

III.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss Plaintiff's Amended Complaint [Doc. #13] is DENIED.

This the 22nd day of July, 2020.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge

28